**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| TANANA CHIEFS CONFERENCE,<br>122 1st Avenue, Suite 600<br>Fairbanks, AK 99701<br><br>       Plaintiff,<br><br>  v.<br><br>ALEX AZAR, Secretary, U.S. Department of Health<br>and Human Services,<br>200 Independence Avenue, S.W.<br>Washington, DC 20201<br><br>MICHAEL WEAHKEE, Director, Indian Health<br>Service,<br>5600 Fishers Lane<br>Rockville, MD 20857<br><br>and<br><br>UNITED STATES OF AMERICA,<br><br>       Defendants. | Case No. 1:20-cv-02902 |

## COMPLAINT

The Tanana Chiefs Conference complains and alleges as follows:

### I.    INTRODUCTION

1.    This action seeks damages for the failure of the United States Indian Health Service (IHS) to pay the Tanana Chiefs Conference (TCC) certain "contract support costs" (CSC) that were due under TCC's Compact with IHS in Fiscal Year (FY) 2013.  TCC's rights arise under its Compact and the statute under which the Compact was awarded, the Indian Self-Determination and Education Assistance Act ("ISDEAA"), 25 U.S.C. §§ 5301-5423.

1

2.     This action follows several Supreme Court decisions finding the federal government's failure to pay full contract support costs to contractors like TCC to be contrary to law and a breach of contract.  *See Salazar v. Ramah Navajo Chapter*, 567 U.S. 182, 192-94 (2012); *Arctic Slope Native Ass'n v. Sebelius*, 133 S. Ct. 22 (2012), *on remand* 501 Fed. App'x 957, 959 (Fed. Cir. 2012) (*Arctic Slope II*); *Cherokee Nation v. Leavitt*, 543 U.S. 631, 636-38 (2005) (consolidated cases).

3.     TCC seeks as damages the unpaid funds which the Secretary should have paid and the associated lost third-party collections which TCC would have collected had each year's unpaid contract support costs been paid in full.  These are the sums necessary to put TCC back in the position it would have been in had IHS not breached its obligations under the ISDEAA and TCC's Compact.

## II.    JURISDICTION

4.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1362; 25 U.S.C. §§ 5331(a), 5331(d), 5391(a); and 41 U.S.C. § 7104 of the Contract Disputes Act.

## III.    PARTIES

5.     The Tanana Chiefs Conference is the tribal health consortium for interior Alaska, comprised of forty-two Alaska Native member villages, thirty-seven of which are federally recognized Alaska Native tribal governments, with its headquarters in Fairbanks, Alaska.  TCC was formed in 1915 to protect Native land rights, tribal self-determination, and regional Native unity.  TCC organized as a nonprofit corporation in 1962, shortly after statehood, and now provides health care, education, economic, and social services for Alaska Natives, American Indians, and other eligible individuals throughout a 235,000 square mile region in interior Alaska.  TCC is a signatory to the Alaska Tribal Health Compact with the Secretary of Health and Human Services, a government-to-government agreement between Alaska tribes and tribal organizations and the

2

United States, and carries out federal programs through funding agreements with IHS. TCC is an "Indian Tribe" as that term is defined by the ISDEAA, 25 U.S.C. § 5304(e). At all relevant times, TCC carried out a compact with IHS pursuant to Title V of the ISDEAA, 25 U.S.C. §§ 5381-5399.

6.     Alex Azar is the Secretary of the U.S. Department of Health and Human Services (HHS). Secretary Azar exercises limited responsibilities designated to him by Congress pursuant to the ISDEAA and other applicable law. Michael Weahkee is the Director of the Indian Health Service. Director Weahkee exercises authority delegated to him by the Secretary to carry out the Secretary's responsibilities under the ISDEAA and other applicable law. As used throughout this Complaint (and unless context commands otherwise), the terms "Secretary," "HHS," "Director," and "IHS" are used interchangeably.

## IV.     FACTS AND GENERAL ALLEGATIONS

### A.     The Contract Documents.

7.     TCC operates various Federal health care programs, functions, services, and activities of the IHS. The health services provided by TCC during the fiscal year at issue, 2013, included inpatient and outpatient hospital-based services, village-based services such as field clinics and a community health aide program (among other services), dental services, behavioral health services, optometry services, home and community care services, nutrition services, ancillary and support services, patient transportation, and environmental health services, among others.

8.     These programs are operated pursuant to the Alaska Tribal Health Compact ("the Compact") with IHS, as authorized under Title V of the ISDEAA.[1] Ex. A. The Compact is the

---

[1]     The Alaska Tribal Health Compact has been amended and restated multiple times since the first version went into effect on October 1, 1994. Relevant to the claims presented here is the FY 2011 version that went into effect on October 1, 2010, and all citations are to that version.

basic contract document at issue in this case. The terms of the Compact are required by and inextricably intertwined with the ISDEAA.  The Compact states that it "shall be liberally construed to achieve its purposes[.]"  Compact, art. I, § 2.  Similarly, Title V, which governs the Compact, provides that "[e]ach provision of [Title V] and each provision of a compact or funding agreement shall be liberally construed for the benefit of the Indian tribe participating in self-governance and any ambiguity shall be resolved in favor of the Indian tribe."  25 U.S.C. § 5392(f).

9.     The Compact was written to "carry out a Self-Governance Program authorized by Title V, and is intended to transfer to tribal governments, at a tribe's request, the power to decide how federal programs, services, functions and activities (or portions thereof) shall be funded and carried out."  Compact, art. I, § 2(a).  It was also meant to "promote[] the autonomy of the Tribes in Alaska in the realm of health care."  *Id.*  Consistent with this purpose, the Compact relies heavily on the provisions of the ISDEAA.

10.    According to the Compact, the core purpose of the Compact between the IHS and TCC was:

> to enable [TCC] to re-design health programs, activities, functions, and services of the Indian Health Service; to reallocate funds for programs, activities, functions, or services according to the priorities of [TCC]; to enhance the effectiveness and long-term financial stability of [TCC]; and to streamline the federal Indian Health Service bureaucracy.

Compact, art. I, § 2(b).

11.    The contract documents also include TCC's Funding Agreement (FA).  Funding agreements can cover single or multiyear periods and may be amended throughout the year to take account of appropriations changes and new funds that are made available.  *See* 25 U.S.C. § 5385(e) ("[E]ach funding agreement shall remain in full force and effect until a subsequent funding agreement is executed.").  In FY 2013, TCC operated pursuant to the multiyear FY 2011-2013 FA

for its Title V funds.  Ex. B.  TCC's FA was incorporated in its entirety into the Compact.  *See* Compact, art. II, § 2(c).

12.     In FY 2013, TCC also operated a separate contract under Title I of the ISDEAA for village-based health care services provided by one of its member Tribes, the Native Village of Tanana.  TCC largely served as a pass-through entity for these funds, and also provided operational support for the Tanana program.  Demands for funds under this contract were not asserted under the 2013 claim at issue here.

13.     The contract documents that are controlling for the FY 2013 claims asserted here are the Alaska Tribal Health Compact, the FA in effect for that year under the Compact, modifications to those documents, and the various statutory and administrative provisions incorporated by law into the contract documents, including the ISDEAA.

### B.     The Contract Agreement.

14.     The contractual obligation of TCC was to administer designated health care programs and provide certain health care services and functions previously provided by IHS. IHS's contractual obligation to TCC was to make certain specified payments to TCC, including payments required for TCC to carry out its administrative duties and other costs of carrying out the Compact.

15.     TCC's Compact was authorized by Title V of the ISDEAA, 25 U.S.C. §§ 5381-5399.  Section 508(c) of Title V of the ISDEAA, 25 U.S.C. § 5388(c), requires that "[t]he Secretary shall provide funds under a funding agreement under this subchapter in an amount equal to the amount that the Indian tribe would have been entitled to receive under self-determination contracts under this chapter, including amounts for direct program costs specified under section 5325(a)(1) of this title and amounts for contract support costs specified under section 5325(a) (2), (3), (5), and (6) . . . ."  This provision entitled TCC to the same amount it would have received had it been

operating a contract with IHS that was awarded under Title I of the Act, 25 U.S.C. §§ 5321-5332,

and specifically the funding provisions set forth in 25 U.S.C. § 5325(a).  Thus, at all relevant times,

25 U.S.C. § 5325(a)(2), (3), and (5), and related funding provisions of Title I of the ISDEAA,

controlled the Secretary's funding obligations under the Compact.  These are the same provisions

that the Supreme Court construed in *Cherokee Nation* and *Ramah*, and that the Federal Circuit

construed in *Arctic Slope II*.

16.     The ISDEAA and TCC's FA required that IHS pay contract support costs.  Section

5325 provides that "[t]here shall be added to the amount required by paragraph (1) [i.e., the

program amount] contract support costs which shall consist of an amount for the reasonable costs

for activities which must be carried on by a tribal organization as a contractor to ensure compliance

with the terms of the contract and prudent management . . . ."  25 U.S.C. § 5325(a)(2).

17.     Contract support costs are mostly "administrative expenses," *Cherokee Nation*, 543

U.S. at 634, although as the Supreme Court has noted, they more precisely fall into one of two

subcategories: (1) indirect administrative (or overhead) contract support costs, "such as special

auditing or other financial management costs," *id.* at 635 (citing § 5325(a)(3)(A)(ii)), and (2) direct

contract support costs for certain annually recurring costs attributable directly to the personnel and

facilities employed to carry out the contracted IHS programs, "such as workers' compensation

insurance," *id.* (citing § 5325(a)(3)(A)(i)).

18. The ISDEAA defines these costs with particularity:

[t]he contract support costs that are eligible costs for the purposes of receiving
funding under this chapter shall include the costs of reimbursing each tribal
contractor for reasonable and allowable costs of—

(i) direct program expenses for the operation of the Federal program that is the
subject of the contract, and

6

> (ii) any additional administrative or other expense related to the overhead incurred by the tribal contractor in connection with the operation of the Federal program, function, service, or activity pursuant to the contract,

except that such funding shall not duplicate any funding provided under subsection (a)(1) of this section.

*Id.* § 5325(a)(3)(A).

19.     Thus, this provision of the ISDEAA obligates IHS to pay (1) all of the "reasonable and allowable costs" associated with additional "direct program expenses for the operation of the Federal program" under contract, plus (2) all of the "reasonable and allowable costs" for "any additional administrative or other expense related to the overhead incurred by the tribal contractor in connection with the operation of the [contracted] Federal program." *Id.* The only limitation on this payment obligation is that a CSC payment may not duplicate a program payment already made to the contractor (i.e., the amount "provided under subsection (a)(1) of [§ 5325]").

20.     The ISDEAA directs that "[u]pon the approval of a . . . contract, the Secretary shall add to the contract the full amount of funds to which the contractor is entitled under [§ 5325(a)], subject to adjustments for each subsequent year that such tribe . . . administers a Federal program, function, service, or activity under such contract." *Id.* § 5325(g); *see id.* § 5396(a) (providing that § 5325(a)-(k) "shall apply to compacts and funding agreements authorized by [Title V]").

21.     The ISDEAA permits, but does not require, that contract support costs be determined in a negotiation between the parties. *Id.* § 5325(a)(3)(B) (Tribes "shall have the option to negotiate with the Secretary the amount of funds that the tribe or tribal organization is entitled to receive under such contract pursuant to this paragraph."). The Secretary's duty to add full contract support costs to a contract is not contingent on such a negotiation.

22.     ISDEAA delegates to the Secretary limited regulatory and discretionary authority. *See Ramah Navajo Sch. Bd. v. Babbitt*, 87 F.3d 1338, 1344 (D.C. Cir. 1996) ("Congress has clearly

expressed in the [ISDEAA] . . . its intent to circumscribe as tightly as possible the discretion of the Secretary," and "[t]he statute itself reveals that not only did Congress *not* intend to commit allocation decisions to agency discretion, it intended quite the opposite; Congress left the Secretary with as little discretion as feasible in the allocation of [contract support costs]" (citation omitted)).

23.     Title V provides that, "[u]nless expressly agreed to by the participating Indian tribe in the compact or funding agreement, the participating Indian tribe shall not be subject to any agency circular, policy, manual, guidance, or rule adopted by the Indian Health Service, except for the eligibility provisions of section 5324(g) of this title and regulations promulgated under this section."  25 U.S.C. § 5397(e).  This provision was expressly incorporated into the Compact and TCC's FA.  *See* Compact, art. I, § 9(a)-(b); FY 2013 FA § 8.4.  The Secretary's Title V regulations do not address contract support cost issues, other than to note that the Secretary must provide contract support costs as specified under the ISDEAA.  42 C.F.R. §§ 137.79, 137.143; *see generally id.* pt. 137. In sum, the ISDEAA provides for full recovery of all contract support costs incurred in carrying out a contract, and the Secretary may not override that statutory command.

24.     During the fiscal year at issue here, IHS calculated and paid contract support costs pursuant to Chapter 6-3 of the Indian Health Manual ("IHS Manual" or "IHM").  *See* Ex. C, Indian Health Serv., *Indian Health Manual*, pt. 6, ch. 3 (2007). This chapter of the IHS Manual explains how IHS determines CSC requirements, but it is not binding on tribal contractors.  *Id.* § 6-3.1(A); *see also* 25 C.F.R. § 900.5 ("Except as specifically provided in the [ISDEAA] . . . an Indian tribe or tribal organization is not required to abide by any unpublished requirements such as program guidelines, manuals, or policy directives of the Secretary . . . .").

25.     The IHS Manual recognizes the statutory contract support costs provisions and provides additional "guidance to both Tribal and Agency personnel" in the negotiation of contract

support costs.  IHM § 6-3.1(A).  The version of the IHS Manual in effect during the relevant time

period acknowledged that:

> Throughout the operation of the program by the awardee, *total contract costs (including CSC) are eligible to be paid* as either direct or indirect costs.  Since Tribes often operate more than one program, many of the costs incurred by the awardee are paid through an indirect cost allocation process, usually negotiated by the "Federal Agency" as identified under the applicable [OMB] Circular.
>
> . . . .
>
> [The ISDEAA] authorizes awardees to be paid CSC costs whether they are "indirect" in nature (benefitting multiple programs) or additional costs associated with operating a single program, except that such funding shall not duplicate any funding provided under [the Secretarial amount].

*Id.* § 6-3.2(B) (emphasis added).

### i.  Indirect Contract Support Costs

26.     Administrative and overhead costs, also known as indirect contract support costs,

are typically calculated by reference to an indirect cost rate.  An indirect cost rate is a common

accounting tool that recipients of federal funds employ to allocate administrative and overhead

costs across multiple programs supported by pooled administrative activities.  *Rumsfeld v. United

Techs. Corp.*, 315 F.3d 1361, 1363 (Fed. Cir. 2003).  Such pooled activities typically include

financial management and accounting systems, information technology systems, insurance,

facilities, procurement activities, and personnel management systems.

27.     An indirect cost rate is calculated by pooling these administrative costs into an

overarching "indirect cost pool," and then dividing that pool by the total amount of direct program

costs that are supported, served, or benefited by the pool.  This calculation results in a ratio known

as an indirect cost rate, which is then applied to the direct cost base of each program supported by

the pool.

28.     In the case of IHS, the direct cost base is comprised of the funds spent under the IHS contract ("the IHS direct cost base").  This method permits a contractor to allocate its pooled indirect costs to each of the supported programs based on an indirect cost rate.

29.     In some instances, contractors break up the direct cost base into subparts, and develop separate indirect cost rates for each subpart.  TCC is such a contractor with multiple indirect cost rates.

30.     When IHS runs a health care program, it uses both appropriated funds from Congress and funds collected from Medicare, Medicaid, and private insurers.  *See* Dep't of Health & Human Servs., FY 2013 IHS Congressional Budget Justification, at CJ-14, 141, https://www.ihs.gov/sites/budgetformulation/themes/responsive2017/documents/FY2013BudgetJ ustification.pdf.  That is, IHS bills Medicare, Medicaid, and private insurance programs, it collects revenues from those programs, and it then uses those revenues to operate additional and larger programs.  *See* 42 U.S.C. §§ 1395–1395*lll*, 1396–1396w-5, 1397aa–1397mm; *see also* H.R. Rep. No. 94-1026, at 108 (1976) ("[T]he Committee firmly expects that funds from Medicare and Medicaid will be used to expand and improve current IHS health care services and not to substitute for present expenditures.").  Revenue from these programs is generally called "third-party revenues," and the generation and expenditure of these revenues is an integral part of IHS operations.

31.     IHS applied TCC's indirect cost rate to determine the amount of indirect contract support costs due to TCC each year.  But IHS failed to apply the rate to the direct cost base associated with the full Federal program carried out by TCC under TCC's Compact with IHS.  Instead, IHS applied the indirect cost rate only to the portion of TCC's IHS direct cost base that was funded with IHS-appropriated dollars.  IHS excluded from the IHS direct cost base the portion

of that base that was funded from third-party revenues TCC generated and spent under the Compact.

32.     In the current version of the IHS Manual, IHS acknowledges that the portion of a Tribe's health care programs funded by third-party revenues may be considered when calculating the amount of contract support costs owed to a Tribe.   IHM §§ 6-3.2(E)(1)(a)(i), (E)(1)(b) (calculating indirect CSC based in part upon "the total direct costs of the total health care program"), 6-3.1(G)(34) (defining "Total Health Care Program" to include "collections from Medicare, Medicaid, and private insurance" in addition to IHS funding), https://www.ihs.gov/ihm/pc/part-6/p6c3/.

### ii.   Direct Contract Support Costs

33.     The ISDEAA also required IHS to fully reimburse TCC's direct contract support costs.  25 U.S.C. § 5325(a)(3)(A)(i).  Direct contract support costs mostly fund fringe benefit and training costs for program employees.  IHM § 6-3.2(D)(1).  As these costs support one particular program, they are therefore charged directly to that program and are not allocated across other programs.

34.     IHS failed to reimburse TCC for its full direct contract support costs incurred in FY 2013.

### C.     Damages due to Lost Third-Party Revenue.

35.     Expectancy damages for breach of the Secretary's Compact with TCC are measured by the amounts required to place TCC in the position it would have been in had there not been a breach.  Thus, "an award of damages will often include an amount representing the profits that were lost as a result of the defendant's breach of contract, because *only by awarding lost profits will the plaintiff be made fully whole*."  Williston on Contracts § 64:2 (4th ed.) (emphasis added);

*see also* Restatement (Second) of Contracts § 347(b) (1981) ("Restatement") (recoverable damages may include "incidental or consequential loss, caused by the breach").

36.     As noted, TCC generates third-party revenues while administering programs under its Compact with IHS, and then spends those funds on additional health care services and purposes. IHS's CSC underpayments in FY 2013 compelled TCC to divert program funds to cover the fixed administrative and overhead expenses, and direct contract support costs, that IHS failed to pay. This directly reduced the funds TCC had available to provide health care services, inflicting on TCC a direct loss in third-party revenues that would have been generated from those services.

37.     Diversion of program money, and the resulting loss of third-party revenues, were foreseeable consequences of the contract support costs underpayments.  *See* U.S. Gov't Accountability Office, GAO-99-150, *Indian Self-Determination Act: Shortfalls in Indian Contract Support Costs Need to be Addressed* 40-41 (1999) (describing use of medical program resources to cover unpaid contract support costs).

38.     Since at least 1987, the federal government has been aware that when Tribes face contract support cost shortfalls, they are forced to use program money to cover the shortfall, which "results in decreased amounts of funds for services," S. Rep. No. 100-274, at 12 (1987); *see also* S. Rep. No. 103-374, at 9 (1994) ("Congress has consistently sought to avoid" a tribe being "compelled to divert program funds to prudently manage the contract"), and that reduced program services meant there would be less billing to and collections from third-party payers.  It was thus reasonably foreseeable that, if IHS underpaid TCC on the amounts due under its Compact for contract support costs, TCC would receive fewer collections from third-party payers.

39.     IHS's breaches of the FY 2013 Compact directly caused TCC to suffer foreseeable damages in the form of lost third-party revenues.

40.    The Government is liable to TCC in damages for the amounts required to place TCC back in the position it would have been in had there been no breach of the Secretary's duty to pay TCC's contract support costs in full, including not only the unpaid contract support costs but also the associated lost third-party collections.

### D.    Interpretation of the Contracts.

41.    In interpreting IHS's obligations, the Supreme Court has directed that "[c]ontracts made under [ISDEAA] specify that '[e]ach provision of the [ISDEAA] and each provision of this Contract shall be liberally construed for the benefit of the Contractor . . . .'" *Ramah*, 567 U.S. at 194 (quoting 25 U.S.C. § 5329(c) (model agreement § 1(a)(2)) (citation updated)).  The Supreme Court has interpreted this language to mean that the government "must demonstrate that its reading [of the ISDEAA] is clearly required by the statutory language." *Id.*

### E.    Claims History.

42.    On September 30, 2019, TCC timely filed a valid claim for reimbursement of its unpaid contract support costs incurred in FY 2013.  Ex. D.

43.    The claim letter alleged a claim only under TCC's Compact and related Funding Agreements.  Although TCC also had a separate Title I contract with IHS during FY 2013, TCC did not make a claim under that contract.  The subject line of the claim letter states that the claim is regarding a "Contract Disputes Act claim for unpaid contract support costs due in FY 2013 *under Indian Self-Determination Act Compact* and associated Funding Agreements." Ex. D at 1 (emphasis added).  The introductory paragraph of the claim letter stated that TCC "hereby claims the right to immediate payment of $12,153,793 plus interest, due and owing to TCC under the provisions of the *above-referenced Compact* and associated funding agreements." *Id.* (emphasis added).  The letter further stated that "[d]uring the covered years, *TCC's Compact*, funding

agreements, indirect cost agreements, and the ISDEAA obligated the United States to pay TCC no less than the full amount of contract support costs." *Id.* (emphasis added).

44.     TCC's claim letter asserted a "sum certain" for this claim.  TCC stated that TCC "claims the right to immediate payment of $12,153,793 plus interest."  Ex. D at 1.  TCC also embedded the following table within its claim letter to further specify the exact amount of direct and indirect contract support costs and expectancy damages it claimed:

| Fiscal Year | Total Direct CSC Due | Total Indirect CSC Due | Expectancy Damages from Additional IDC on Unfunded IDC & DCSC | Expectancy Damages from Lost Third-Party Revenue | Total |
|---|---|---|---|---|---|
| FY 2013 | $3,347,642 | $4,085,965 | $1,767,329 | $2,952,857 | $12,153,793 |

TCC "set[] out the specific amount it is seeking," fulfilling the CDA's sum certain requirement.

45.     TCC's claim letter expressly included all four components of the certification requirement found in 41 U.S.C. § 7103(b)(3).  Ex. D at 3 (certification of CDA claims by TCC's Executive Financial Officer).  Specifically, TCC certified that its claim was made in good faith, the supporting data were believed to be accurate and complete, the amount requested reflected the amount for which the contractor believes the government is liable, and the certifier was authorized to certify the claim.

46.     On November 26, 2019, IHS responded to TCC's claim letter and stated that TCC's claim was not a "proper claim" under the CDA because TCC did not "specify which contract has been breached for what amount."  Ex. E.  IHS alleged that TCC's claim letter "asserts claim(s) for breaches of two contracts and/or funding agreements or compact for $12,153,793, without information regarding the amount at issue as to either contract."  *Id.*  Because in IHS's opinion the claim letter did not state a "sum certain under the contract," it concluded that it was "not required to render a decision on the claim or claims."  *Id.*

47.     To aid IHS's review of its claim, TCC attached calculations to its claim letter.  TCC acknowledges that the heading of one of the columns in the calculations tables referenced its Title I contract, but TCC also explained it was providing these tables solely to "facilitate the agency's review of these claims" and "for discussion purposes only."  The calculations table does not negate the clear language of the claim letter. The calculations table is not a required part of a valid claim under the CDA.  *See H.L. Smith, Inc. v. Dalton*, 49 F.3d 1563, 1564 (Fed. Cir. 1995) ("[N]either the CDA nor its implementing regulations . . . requires submission of a detailed cost breakdown or other specific cost-related documentation with the claim.").  The Title I contract was never mentioned in the actual claim letter.  *See CPS Mech. Contractors, Inc. v. United States*, 59 Fed. Cl. 760, 764 (2004) (looking to "the totality of the correspondence" to determine whether contractor "provide[d] the CO with the basis for its claim").  Thus, IHS erred in asserting that the claim letter was not a "proper claim."

48.     A valid claim under the CDA "is a written demand by one of the contracting parties, asking for . . . [p]ayment of a specific sum of money under the contract." 25 C.F.R. § 900.218(a)(1).  The sum certain requirement is satisfied if "the contractor sets out the specific amount it is seeking or if the amount in dispute can be easily determined by a simple mathematical calculation or from the contractor's submission."  *CPS Mech. Contractors, Inc.*, 59 Fed. Cl. at 764 (concluding sum certain requirement not met where contractor failed to provide "any dollar figure or documentation that could be used to compute a dollar figure").

49.     Although it is the contractor's obligation to include in its claim "its best effort to state a sum certain," that sum "c[an] [be] modified later to fit the proof."  *Northrop Grumman Sys. Corp. v. United States*, 140 Fed. Cl. 249, 257 (2018); *see also K-Con Bldg. Sys., Inc. v. United States*, 114 Fed. Cl. 722, 733 (2014) (sum certain requirement met even though precise amount

15

claimed not specified because the amount could be calculated based on the rate for damages set forth in the contract). TCC specifically reserved this right in its claim letter by stating that it "endeavored to calculate its claims based upon the best available evidence, including its audits and financial records," but that "[a]s additional documentation and information becomes available, and as additional analysis proceeds, the amount claimed herein or to be claimed in the event of any appeal, is subject to adjustment." Ex. D at 2.

50.     A claim under the CDA need not "be 'submitted in any particular form or use any particular wording,'" so long as the contractor "provide[s] 'a clear and unequivocal statement that gives the contracting officer adequate notice of the basis and amount of the claim.'" *CPS Mech. Contractors*, 59 Fed. Cl. at 763 (quoting *Cont. Cleaning Maint., Inc. v. United States*, 811 F.2d 586, 592 (Fed. Cir. 1987)). "To determine whether the contractor has satisfied these requirements, the Court uses a 'common sense analysis' and views the contractor's submissions as a whole." *Id.* at 763 (quoting *Kirkham Constructors, Inc. v. United States*, 30 Fed. Cl. 90, 93 (1993)).

51.     IHS declined to render a decision based on 41 U.S.C. § 7103(b)(3). That section provides that "[a] contracting officer is not obligated to render a final decision on a claim of more than $100,000 that is not certified in accordance with [§ 7103(b)(1)]." *Id.* Section 7103(b)(1) requires a contractor to certify that its claim is made in good faith, the supporting data are believed to be accurate and complete, the amount requested reflects the amount for which the contractor believes the government is liable, and the certifier is authorized to certify the claim. TCC provided such a certification.

52.     Even if TCC's letter did not meet certification requirements, "[a] defect in the certification of a claim does not deprive a court . . . of jurisdiction over the claim." *Id.* § 7103(b)(3); *see also Modeer v. United States*, 68 Fed. Cl. 131, 138 (2005), *aff'd*, 183 F. App'x

975 (Fed. Cir. 2006) (concluding technically defective certification would not deprive court of jurisdiction because it "complie[d] with the spirit and intent of the certification requirement, which is to deter fraud").

53.     Under the CDA, IHS's refusal to render a decision constitutes a denial of TCC's claims that is subject to judicial review.  *See* 41 U.S.C. § 7103(f)(5) ("Failure by a contracting officer to issue a decision on a claim within [60 days] is deemed to be a decision . . . denying the claim and authorizes an appeal or action on the claim."); *SCM Corp.*, 225 Ct. Cl. 647 (1980) (contractor may deem claims denied if contracting officer fails to issue a decision within 60 days); *Claude E. Atkins Enters., Inc. v. United States*, 27 Fed. Cl. 142, 146 (1992) (contractor may deem claims denied if time for a decision "is left open-ended," as "any needless ambiguities will be read against the government").

### COUNT I – BREACH OF CONTRACT (UNDERPAYMENT OF DIRECT AND INDIRECT CONTRACT SUPPORT COSTS ASSOCIATED WITH THE ENTIRE FEDERAL PROGRAM UNDER CONTRACT)

54.     TCC incorporates all previous allegations of fact and law into this Cause of Action.

55.     TCC's Compact required the Secretary to pay in full TCC's contract support cost requirements.  In doing so, the Compact incorporated the statutory provisions of the ISDEAA requiring full payment of contract support costs.  In *Cherokee Nation*, 543 U.S. at 636-38, *Ramah*, 567 U.S. at 192-94, and *Arctic Slope II*, 501 Fed. App'x at 959, the Supreme Court and the Federal Circuit affirmed the federal government's duty to pay ISDEAA contracts in full.

56.     General contract principles control the calculation of damages in government contract litigation.  This is so because "[w]hen the United States enters into contract relations, its rights and duties therein are governed generally by the law applicable to contracts between private individuals."  *United States v. Winstar Corp.*, 518 U.S. 839, 895 (1996) (quoting *Lynch v. United States*, 292 U.S. 571, 579 (1934)); *see also Mobil Oil Expl. & Producing Se., Inc. v. United States*,

530 U.S. 604, 607-08 (2000) (quoting *Winstar*, 518 U.S. at 895, and relying on the Restatement

(Second) of Contracts); *Franconia Assocs. v. United States*, 536 U.S. 129, 141 (2002) (quoting

*Mobil Oil*, 530 U.S. at 607, and applying principles of general contract law).

57.     General contract law on the issue of damages is clear that a contractor is entitled to

damages which will protect "his 'expectation interest,' which is his interest in having the benefit

of his bargain *by being put in as good a position as he would have been in had the contract been

performed . . . .*" Restatement § 344(a) (emphasis added).

58.     In order to fulfill TCC's "expectation interest" arising from the Secretary's breach

of contract for failing to pay the contract amount owed, TCC is entitled to damages for the

underpayment of its contract support costs, together with accrued interest and attorney's fees and

costs, as specifically prayed below.

59.     IHS failed to pay the full amount of direct contract support costs that TCC incurred

while operating the Federal program under its Compact with IHS.  In FY 2013, IHS underpaid

TCC's direct contract support costs by $3,347,642.

60.     IHS failed to pay the full amount of indirect contract support costs that TCC

incurred while operating the Federal program under its Compact with IHS.  In FY 2013, IHS

underpaid TCC's indirect contract support costs by $4,085,965.

### COUNT II – BREACH OF CONTRACT (FAILURE TO PAY CONTRACT SUPPORT COSTS TO SUPPORT THE PORTION OF THE FEDERAL PROGRAM SUPPORTED BY IHS APPROPRIATED DOLLARS)

61.     IHS failed to pay the full amount due TCC even under IHS's own deficient

calculations.  In FY 2013 IHS failed to reimburse TCC for TCC's full administrative and overhead

costs associated administering the portion of TCC's Federal program that was funded by IHS-

appropriated dollars.

62.     IHS failed to pay the full amount of direct contract support costs that TCC incurred while operating the portion of the Federal program under its Compact supported only with appropriated dollars.   In FY 2013, IHS underpaid TCC's direct contract support costs by $3,347,642.  *See* Ex. D at 6.

63.     IHS failed to pay the full amount of indirect contract support costs that TCC incurred while operating the portion of the Federal program under its Compact supported only with appropriated dollars.  In FY 2013, IHS underpaid TCC's indirect contract support costs by $1,182,563.  *See* Ex. D at 6.[2]

64.     IHS failed to pay a total of $4,530,205 in contract support costs (direct and indirect costs) incurred in carrying out the portion of the Federal program supported by IHS-appropriated dollars.  In doing so, the government breached the ISDEAA and its Compact with TCC.

**COUNT III – BREACH OF CONTRACT (FAILURE TO PAY INDIRECT CONTRACT SUPPORT COSTS ASSOCIATED WITH THIRD-PARTY REVENUES-FUNDED PORTION OF THE FEDERAL PROGRAM)**

65.     TCC incorporates all previous allegations of fact and law into this Cause of Action.

66.     When TCC took over operation of IHS's comprehensive Federal health care programs, controlling law authorized TCC to continue to bill, collect, and spend third-party revenues.  25 U.S.C. §§ 1621e(a), 1621f(a)(1), 1641(c)(1)(B), 1641(d), 5325(m); 42 U.S.C. §§ 1395qq, 1396j, 1397aa–1397mm.

---

[2] This calculation is based only on IHS-appropriated dollars, rather than the full IHS direct cost base for TCC's health program, because IHS has previously asserted that claims for direct and indirect contract support costs should be broken down according to the portion of TCC's health program funded by IHS-appropriated dollars versus other funding sources.  To facilitate this court's review, TCC has therefore broken down its costs in this manner.  But TCC does not agree that only the parts of its health programs supported by IHS-appropriated dollars are eligible for contract support costs, and therefore TCC did not present its claim in this manner.  Indirect contract support costs associated with the third-party revenues-funded portion of TCC's health program were included in TCC's claim, but are claimed separately here in Count III.

67.     TCC was entitled to have contract support costs added to support the entirety of the IHS Federal programs it operated, regardless of the extent to which those Federal programs were funded by appropriated dollars or third-party revenue dollars.

68.     IHS failed to calculate and pay the administrative costs of operating the third-party revenue-funded portion of its IHS Compact, even though generating those revenues and spending them on health care was expressly contemplated by the Compact and was an integral and essential part of the Federal program described in the Compact.  *See* Compact, art. III, § 7; FY 2013 FA § 1.1.3.

69.     IHS's failure to pay TCC indirect contract support costs associated with TCC's third-party revenue supported health care operations—that is, the failure to include these third-party revenues in the IHS direct program base against which TCC's indirect cost rate was applied—resulted in significant underpayments to TCC of indirect contract support costs.  It was also contrary to law.  *Id.*

70.     TCC incurred no less than $2,903,402 in indirect contract support costs associated with the expenditure of third-party revenue that was generated as a result of the IHS award.  *See* Ex. D at 5-6.[3]  IHS did not pay any indirect costs associated with these expenditures.  In failing to pay TCC this amount, the government breached its Compact with TCC.

**COUNT IV – BREACH OF CONTRACT (LOST THIRD-PARTY REVENUES)**

71.     TCC incorporates all previous allegations of fact and law into this Cause of Action.

---

[3]     This calculation is based on the difference between TCC's total indirect contract support costs shortfall in Count I (which includes third-party revenues in the IHS direct program base against which TCC's indirect cost rate was applied), *see* Ex. D at 5 (line 18), and TCC's indirect contract support costs shortfall in Count II (which only includes IHS-appropriated dollars in the IHS direct program base against which TCC's indirect cost rate was applied), *see* Ex. D at 6 (line 9).

72.     IHS's breaches of the FY 2013 Compact also caused TCC damages in the form of lost third-party revenues.  These damages were caused by IHS, were a foreseeable result of underpaying contract support costs, and are quantifiable.  TCC has lost an additional $2,952,857 in lost third-party revenues and contract support costs due to the government's breaches in FY 2013.  *See* Ex. D at 5 (lines 45-46).

## COUNT V—BREACH OF STATUTORY RIGHT

73.     TCC incorporates all previous allegations of fact and law into this Cause of Action.

74.     The ISDEAA creates a right of action for money damages to remedy the Secretary's breach of his obligations under the ISDEAA.  25 U.S.C. § 5331.

75.     Under 25 U.S.C. §§ 5325(a)(2)-(3), the Secretary in FY 2013 had a statutory duty to pay TCC full contract support costs.

76.     The Secretary failed to pay TCC no less than $7,433,607 in contract support costs due in FY 2013.

77.     TCC also lost an additional $2,952,857 as a result of this statutory violation.

78.     In order to remedy the Secretary's breach of his statutory obligations, TCC is entitled to damages of no less than $10,386,464,[4] plus applicable interest and attorneys' fees and costs, all as specifically prayed below.

## V.     PRAYER FOR RELIEF

WHEREFORE, TCC prays that this Court grant the following relief:

---

[4] The original claim sought a total of $12,153,793 in damages.  For purposes of this appeal, TCC is not pursuing the expectancy damage claim for additional indirect costs on underfunded contract support costs.  The omission of this claim accounts for the difference in the amount of damages.

21

(a)     A declaratory judgment that in FY 2013 the Secretary acted in violation of the ISDEAA by failing to pay TCC the full amount of contract support costs that TCC was due under its contract with the Secretary;

(b)     A declaratory judgment that in FY 2013 the Secretary breached his Compact with TCC by failing to pay TCC's full contract support cost requirement;

(c)     A money judgment of $10,386,464;

(d)     Interest for one year from the date each unpaid amount comprising the $10,386,464 was due, as provided for under the Prompt Payment Act, 31 U.S.C. §§ 3901-3907;

(e)     Interest under the Contract Disputes Act, 41 U.S.C. §§ 7101-7109, from the date each claim was filed to the date of final payment made pursuant to a judgment of this Court;

(f)     Costs and attorneys' fees incurred in pursuing this claim, as provided for under the Equal Access to Justice Act, 5 U.S.C. § 504; 28 U.S.C. § 2412; the ISDEAA, 25 U.S.C. § 5331(c), and other applicable law; and

(g)     Such other monetary, declaratory, and equitable relief as this Court may find to be just.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

Respectfully submitted this 9th day of October 2020.

SONOSKY, CHAMBERS, SACHSE
MILLER & MONKMAN, LLP

By: _/s/ Lloyd B. Miller_
    Lloyd B. Miller
    D.C. Bar No. 317131
    Alaska Bar No. 7906040
    lloyd@sonosky.net
    Rebecca A. Patterson (application for
      admission _pro hac vice_ forthcoming)
    Alaska Bar No. 1305028
    Illinois Bar No. 6306987
    rebecca@sonosky.net
    Sonosky, Chambers, Sachse,
      Miller & Monkman, LLP
    725 East Fireweed Lane, Suite 420
    Anchorage, AK 99503
    Telephone No.: 907-258-6377
    Fax No.: 907-272-8332