**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

TANANA CHIEFS CONFERENCE,

       *Plaintiff*,

    v.

XAVIER BECERRA, Secretary of U.S.
Department of Health and Human Services, *et al.*,

       *Defendants*.

Civil Action No. 20-2902 (RDM)

<u>**MEMORANDUM OPINION AND ORDER**</u>

Plaintiff Tanana Chiefs Conference ("TCC") brings this breach-of-contract action against the Secretary of the Department of Health and Human Services and the Director of the Indian Health Service (collectively, "IHS") seeking damages for IHS's failure to pay TCC certain amounts allegedly due under an agreement between the parties known as the Alaska Tribal Health Compact.[1]  Dkt. 1 (Compl.).  IHS moves to dismiss the case for lack of subject-matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1), Dkt. 15, arguing that (1) TCC failed to comply with the presentment requirement contained in the Contract Disputes Act ("CDA"), 41 U.S.C. §§ 7101, *et seq*., and, then, attempting to rectify that misstep, (2) TCC changed the nature of its claim before this Court, again in violation of the CDA.  Dkt. 15-1 at 6.

---

[1] Pursuant to Fed. R. Civ. P. 25(d), the current Secretary of Health and Human Services, Xavier Becerra, and the current Director of IHS, Elizabeth A. Fowler, are "automatically substituted" as parties with no effect on TCC's "substantial rights."  Fed. R. Civ. P. 25(d).

The Court is unpersuaded.  The claim that TCC submitted to IHS gave the agency "adequate notice of the basis and amount of the claim," and that is all that is required.  *Cont. Cleaning Maint., Inc. v. United States*, 811 F.2d 586, 592 (Fed. Cir. 1987).  And although TCC's claim before this Court is not identical to the one that it presented to IHS, it is "based on the same set of operative facts underlying the claim presented to [IHS]," which, once again, is all that the CDA requires.  *Tunica-Biloxi of La. v. United States*, 577 F. Supp. 2d 382, 409 (D.D.C. 2008) (internal quotation marks omitted) (alteration in original).

The Court will therefore **DENY** IHS's motion to dismiss.

## I.  BACKGROUND

### A.      Statutory Background

IHS is a component of the Department of Health and Human Services ("HHS") charged with providing medical and public health services to American Indian and Alaska Native people. *See Lincoln v. Vigil*, 508 U.S. 182, 185 (1993).  It is responsible for administering federal health care programs for the benefit of these communities in the first instance.  *See* 25 U.S.C. § 1661(c). But under the Indian Self-Determination and Education Assistance Act (the "ISDEAA"), 25 U.S.C. § 5301 *et seq.*, a tribe can elect to contract with the Secretary of HHS (through IHS) to take over the operation and administration of these programs, *id.* § 5321(a)(1).  ISDEAA contracts come in different forms, two of which are relevant here.  A "self-determination contract," authorized by Title I of the ISDEAA, is a discrete agreement for the transfer of responsibility over a federal program.  *Id.*  A "self-governance compact," authorized by Title V, is a more involved agreement that "set[s] forth the general terms of the government-to-government relationship between the Indian tribe and the Secretary."  *Id.* § 5384(b).  A compact can entail the transfer of responsibility over multiple government programs to the tribe or tribal

organization and is accompanied by a funding agreement detailing the funds the federal government will provide for the operation and administration of these programs. *Id.* § 5385.

In either case, IHS agrees to provide two types of funding to the tribe or tribal organization with which it has contracted. *Id.* § 5325(a). The first, known as the "baseline" or "Secretarial amount," *Tunica-Biloxi Tribe of La.*, 577 F. Supp. 2d at 388, is a quantum of funding "not . . . less than" the Secretary would have provided for the operation of the relevant program had it remained under federal management, 25 U.S.C. § 5325(a)(1). The second type is for "contract support costs" ("CSCs"). *Id.* § 5325(a)(2). These cover the incremental administrative expenses that a contracting tribe or tribal organization incurs to manage and oversee the contract appropriately. *Id.*; *Cherokee Nation of Okla. v. Leavitt*, 543 U.S. 631, 634–35 (2005). The statute subdivides CSCs into two further categories: direct and indirect. 25 U.S.C. § 5325(a)(3)(A). Direct contract support costs pertain to a particular program and include items such as workers' compensation insurance and training costs for employees dedicated to that program. *See Cherokee Nation*, 543 U.S. at 635; Dkt. 1 at 11 (Compl. ¶ 33). Indirect contract support costs, by contrast, cover overhead costs for items that benefit multiple programs and include items such as information technology expenses and the cost of financial management tools. *See id.*; 25 U.S.C. § 5325(a)(3)(A)(ii); Dkt. 1 at 9 (Compl. ¶ 26).

Because indirect costs relate to overhead benefiting more than one program, IHS and the contracting tribe or tribal organization try to allocate these costs amongst the various programs they support. Dkt. 1 at 9 (Compl. ¶ 26). This cost allocation is typically accomplished using what is known as an "indirect cost rate," a ratio calculated by dividing the total indirect costs by the total amount of direct costs of all the programs to which the indirect cost pool pertains. *Id.* (Compl. ¶¶ 26–27). The resulting ratio is then applied to the direct costs of each individual

program to determine the dollar value of indirect costs attributable to that program. *Id.* (Compl. ¶ 27).

Disputes that arise under the ISDEAA are subject to the CDA, 25 U.S.C. §§ 5331(d), 5391(a), which provides a "comprehensive framework for resolving contract disputes between executive branch agencies and government contractors," *Menominee Indian Tribe of Wisc. v. United States*, 614 F.3d 519, 521 (D.C. Cir. 2010). The CDA contains a "mandatory administrative process"—referred to as "presentment"—that "requires contractors to present '[e]ach claim' they have to a contracting officer for decision." *Menominee Indian Tribe of Wisc. v. United States*, 577 U.S. 250, 252 (2016) (alteration in original) (quoting 41 U.S.C. § 7103(a)). Once a claim has been presented, a contracting officer must provide a final decision on the claim within a specified period, typically 60 days. 41 U.S.C. §§ 7103(d), 7103(f)(1)–(2). "Failure by a contracting officer to issue a decision on a claim within the required period of time is deemed to be a decision by the contracting officer denying the claim." *Id.* § 7103(f)(5).

After this process has run its course, dissatisfied claimants have a right to challenge the contracting officer's decision. The CDA typically allows claimants to appeal to an agency board or to seek judicial review in the United States Court of Federal Claims. *Id.* § 7104(a)–(b)(1). The ISDEAA provides tribes and tribal organizations a third option: review in federal district court. 25 U.S.C. § 5331(a).

**B.      Factual Background**

Except where specifically controverted by evidence submitted in support of IHS's motion to dismiss for lack of jurisdiction, the following allegations are taken as true for purposes of the pending motion. *See Phoenix Consulting Inc. v. Republic of Angola*, 216 F.3d 36, 40 (D.C. Cir. 2000).

The Tanana Chiefs Conference is an Alaska-based tribal health organization—an "Indian Tribe" under the ISDEAA—comprised of forty-two Alaska Native member villages.  Dkt. 1 at 2 (Compl. ¶ 5).  It is a party to the Alaska Tribal Health Compact (the "Title V Compact"), a self-governance compact under Title V of the ISDEAA between a number of Alaskan tribes and tribal organizations and IHS.  *Id.* (Compl. ¶ 5).  In 2013, TCC was also party to a separate Title I self-determination contract (the "Title I Contract") with IHS pertaining to one of TCC's member tribes, the Native Village of Tanana.  *Id.* at 5 (Compl. ¶ 12).

Under the Title V Compact, TCC operates and administers a variety of federal health care programs and receives funding for these activities through a funding agreement incorporated into the compact.  *Id.* (Compl. ¶¶ 7–8, 11, 15).  During the period relevant to this litigation, the Title V Compact operated pursuant to a multiyear funding agreement known as the "FY 2011-2013 FA."  *Id.* at 4–5 (Compl. ¶ 11).  That funding agreement, like other such agreements, required IHS to pay TCC the "Secretarial amount" as well as both direct and indirect contract support costs, as those concepts are defined in 25 U.S.C. § 5325.  *Id.* at 5–7 (Compl. ¶¶ 15–19).  For purposes of the Title V Compact, indirect costs were calculated using the indirect cost rate methodology, and TCC's indirect cost rates were developed for separate subparts of direct costs, resulting in multiple indirect cost rates.  *Id.* at 9–10 (Compl. ¶¶ 27–29).

This litigation concerns the amount of contract support funding IHS owes TCC for fiscal year 2013.  *Id.* at 10–11 (Compl. ¶¶ 31, 34).  Although the merits of the parties' dispute are not at issue today, the short of it is that TCC alleges that IHS did not adequately reimburse it for both its direct and indirect contract support costs.  *Id.* (Compl. ¶¶ 31, 34).  As to the former, TCC contends that IHS failed to pay TCC in full for its direct contract support costs.  *Id.* at 11 (Compl.

¶ 34). With respect to the latter, TCC alleges that IHS applied the relevant indirect cost rate to the wrong direct cost base, resulting in IHS underpaying TCC. *Id.* at 10 (Compl. ¶ 31).

On September 30, 2019, TCC sent a claim letter to IHS requesting reimbursement for the contract support costs that it contends IHS improperly withheld in 2013. *Id.* at 13 (Compl. ¶ 42). The subject of the letter was: "Contract Disputes Act claim for unpaid contract support costs due in FY 2013 under Indian Self-Determination Act Compact and associated Funding Agreements." Dkt. 1-4 at 1. The letter begins with the following text and table:

> The Tanana Chiefs Conference (TCC) hereby claims the right to immediate payment of $12,153,793 plus interest, due and owing to TCC under the provisions of *the above-referenced Compact and associated funding agreements*, as amended, in effect between the parties for fiscal year 2013:

| Fiscal Year | Total Direct CSC Due | Total Indirect CSC Due | Expectancy Damages from Additional IDC on Unfunded IDC & DCSC | Expectancy Damages from Lost Third-Party Revenue | Total |
|---|---|---|---|---|---|
| FY 2013 | $3,347,642 | $4,085,965 | $1,767,329 | $2,952,857 | $12,153,793 |

*Id.* (emphasis added). The letter goes on to explain that "[d]uring the covered years, TCC's *Compact*, funding agreements, indirect cost agreements, and the ISDEAA obligated the United States to pay TCC no less than the full amount of contract support costs, including indirect costs and direct contract support costs, associated with TCC's operation of the IHS programs, functions, services, and activities specified in TCC's *contracts* with IHS, as amended." *Id.* (emphasis added). It further states that TCC's claims "seek the sums set forth above and, without limitation, all other damages arising out of IHS's failure to pay full contract support costs as required by the ISDEAA and TCC's *contracts*." *Id.* at 2. (emphasis added). These claims, TCC adds, are "supported by the originals of *all contracts*, contract modifications,

funding agreements, amendment thereto, indirect cost rate agreements, and audits, all of which are in the custody of the Government." *Id.* at 2 (emphasis added).

Appended to the letter are two pages of financial schedules. The first page sets forth TCC's preferred methodology for categorizing costs. *Id.* at 2, 5. The second page sets forth an alternative methodology should IHS disagree with TCC's preferred approach and, instead, require "that claims for direct and indirect CSC . . . be further broken down according to the portion of TCC's health program funded by IHS appropriated funds versus other funding sources." *Id.* at 2, 6. As the letter explains, TCC provided this alternative analysis "to facilitate the agency's review of these claims." *Id.* at 2. For both methodologies, however, the left column on the schedule includes the contract numbers for both the Title I Contract and the Title V Compact, and right most column of the schedule, which contains the dollar value figures, is labeled "TANANA CHIEFS CONFERENCE Title I & V Agreements." *Id.* at 5, 6.

IHS responded to TCC's claim letter on November 26, 2019, with two almost identical letters—one addressing TCC's Title I Contract and the other addressing TCC's Title V Compact. Both responses assert: "IHS hereby determines that the [TCC claim] letter does not constitute a proper claim under the CDA," because it did not adhere to the "requirement that a claim ask for payment of a specific sum of money under the contract," as mandated by 25 C.F.R. § 900.218(a)(1). Dkt. 1-5 at 1–2. According to IHS, TCC's letter did not specify "which contract has been breached for what amount," but, rather, "assert[ed] claim(s) for breaches of two contracts and/or funding agreements or compact for $12,153,793, without information regarding the amount at issue as to either contract." *Id.* As a result, according to IHS, "[t]he [claim] letter and attachments did not state a sum certain under the contract in accordance with

the law," and "the awarding official [was] not required to render a decision on the claim or claims." *Id.*

## C.    Procedural Background

TCC filed this lawsuit on October 9, 2020, asserting four breach-of-contract claims and one claim for breach of the ISDEAA.  Dkt. 1 at 17–21 (Compl. ¶¶ 60, 64,70, 72, 78).  TCC asks the Court for declaratory relief; $10,386,464 in damages plus interest; and fees and costs.  Dkt. 1 at 22.  The $10,386,464 in damages that TCC seeks is equal to the $12,153,793 it sought before IHS, less the $1,767,329 it requested at that time for "Expectancy Damages from Additional IDC [(indirect costs)] on Unfunded IDC & DCSC [(direct contract support costs)]."  Dkt. 1 at 21 n.4, 22; Dkt. 1-4 at 1.

TCC's complaint disavows any claim under the Title I Contract and states that TCC has only ever sought damages related to the Title V Compact.  Dkt. 1 at 5, 13, 15 (Compl. ¶¶ 12, 43, 47).  Although TCC "acknowledges that the heading of one of the columns in the calculations tables referenced its Title I contract," it contends that these tables were not part of its "claim," which was embodied only in the claim letter.  *Id.* at 15 (Compl. ¶ 47).  From TCC's perspective, the data tables were analytical aides that TCC included in its submission merely to help IHS review TCC's claim and that do not negate the claim letter's focus on the Compact.  *Id.* (Compl. ¶ 47).  All that matters, according to TCC, is that the letter only sought payment pursuant to the "Compact and associated Funding Agreements."  Dkt. 1-4 at 1.

IHS moves to dismiss TCC's complaint for lack of subject-matter jurisdiction.  Dkt. 15. IHS's position is that TCC failed properly to present its claim at the administrative level and therefore failed to satisfy a mandatory prerequisite to this Court's jurisdiction under the CDA and ISDEAA.  Dkt. 15-1 at 17.  In addition, IHS argues that TCC's complaint represents an

improper effort to cure its defective presentment and to circumvent the CDA's procedures. *Id.* at 17, 19–22. As IHS sees it, TCC initially brought claims under both its Title V Compact and Title I Contract but now seeks damages only for breach of its Title V Compact. *Id.* at 19–22. That, IHS insists, amounts to TCC pursuing a different claim judicially than it did administratively, something the CDA forbids. *Id.*

## II.   ANALYSIS

### A.      Whether TCC Adequately Submitted a "Claim" to IHS

"Subject matter jurisdiction defines the [tribunal's] authority to hear a given type of case." *Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009). The issue of subject-matter jurisdiction arises here because TCC is suing the United States and its agencies (through its officers), and, "[a]bsent a waiver, sovereign immunity shields the Federal Government and its agencies from suit." *FDIC v. Meyer*, 510 U.S. 471, 475 (1994). Because "[s]overeign immunity is jurisdictional in nature[,] . . . the 'terms of the [the United States'] consent to be sued in any court define that court's jurisdiction to entertain the suit.'" *Id.* (third alteration in original) (quoting *United States v. Sherwood*, 312 U.S. 584, 586 (1941)). As the Court will explain in more detail shortly, the ISDEAA contains a limited waiver of sovereign immunity, 25 U.S.C. § 5331(a), but it conditions that waiver on a party presenting its claim to a contracting officer for decision before suing in federal court, *id.* § 5331(d); 41 U.S.C. § 7103(a)(1).

Although the plaintiff bears the burden of demonstrating that the court has subject-matter jurisdiction, the nature of that burden varies depending on the stage of the proceeding. *Lujan v. Defs. Of Wildlife*, 504 U.S. 555, 561 (1992). At the motion-to-dismiss stage, it is often sufficient for the plaintiff to allege facts sufficient to sustain the court's jurisdiction. *Id.* But an opposing party may increase the stakes by "pos[ing] a 'factual' challenge to the Court's jurisdiction," *Hale*

*v. United States*, No. 13-1390, 2015 WL 7760161, at *3 (D.D.C. Dec. 2, 2015), which requires

the court to "go beyond the pleadings and [to] resolve any disputed issues of fact the resolution

of which is necessary to a ruling upon the motion to dismiss," *Phoenix Consulting Inc.*, 216 F.3d

at 40.  When the movant raises such a factual challenge, the Court may consider the

uncontroverted allegations contained in the complaint, any undisputed facts, and "the court's

resolution of disputed facts."  *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 197 (D.C. Cir.

1992).

Although IHS asks the Court to consider two documents that were not attached to the

complaint, which it suggests support its thesis that the schedules attached to TCC's claim

"appear to derive their values from both the Title I Contract and the Title V FY 2013 Funding

agreement," Dkt. 15-1 at 22, the pending motion more closely resembles a facial, rather than a

factual, challenge to the Court's jurisdiction.  For one thing, IHS has not offered a declaration

explaining the calculation that it asks the Court to make.  But, more importantly, the dispute

between the parties is, in relevant respects, principally a dispute about how best to characterize

TCC's September 30, 2019 claim letter, and not a dispute about the underlying facts.  In this

sense, TCC's allegation that it did not submit a claim for payment under its Title I Contract is not

a "factual" allegation entitled to a presumption of truth, *see Ashcroft v. Iqbal*, 556 U.S. 662, 678

(2009) (conclusory statements and legal conclusions need not be accepted as true), nor is it

dispositive of the question presented.  And, by the same token, IHS's contention that the

schedules "appear to derive their value from both the Title I Contract and [the] Title V" Compact

does not resolve the matter.  Dkt. 15-1 at 22.  Rather, the question presented is simply whether

TCC's letter provided IHS with sufficient notice of TCC's claim to trigger the applicable waiver

of sovereign immunity.

As noted above, the ISDEAA waives sovereign immunity for certain disputes arising under its provisions, 25 U.S.C. § 5331(a), and incorporates the procedural requirements of the CDA, *id* § 5331(d).  To avail itself of the ISDEAA's sovereign-immunity waiver, a party must adhere to those of the CDA's requirements that constitute the preconditions of the United States' consent to suit.  *See James M. Ellett Const. Co., Inc. v. United States*, 93 F.3d 1537, 1541–42 (Fed. Cir. 1996).  The Court of Appeals for the Federal Circuit, the court of appeals most often tasked with review of CDA actions, *see* 41 U.S.C. § 7104(b)(1); 28 U.S.C. § 1295(a)(3), has held that presentment is one such requirement, explaining that absent "both a valid claim . . . and a contracting officer's final decision on that claim," courts lack jurisdiction to hear actions brought under the CDA.  *James M. Ellett Const.*, 93 F.3d at 1541–42; *M. Maropakis Carpentry, Inc. v. United States*, 609 F.3d 1323, 1327–28 (Fed. Cir. 2010).  This Court has held the same, and the parties have not urged the Court to adopt a contrary view.  *Tunica-Biloxi Tribe of La.*, 577 F. Supp. 2d at 407–08.  Accordingly, to meet its burden of establishing that this Court has jurisdiction, TCC must show that it presented its claim to IHS in accordance with the CDA and that it now brings suit respecting that same claim.

The first part of the inquiry turns on whether TCC's submission meets the definition of a "claim" under the CDA and ISDEAA.  IHS regulations define the term "claim" to mean "a written demand by one of the contracting parties, asking for one or more of the following: (1) [p]ayment of a specific sum of money under the contract; (2) [a]djustment or interpretation of contract terms; or (3) [a]ny other claim relating to the contract."  25 C.F.R. § 900.218(a).  This definition echoes the definition of a CDA "claim" contained in the Federal Acquisition Regulations: "[a] written demand or written assertion by one of the contracting parties seeking, as a matter of right, the payment of money in a sum certain, the adjustment or interpretation of

contract terms, or other relief arising under or relating to the contract."  48 C.F.R. § 52.233-1(c).

All agree that TCC's letter to IHS was a written demand asking for payment of money.  The

question, therefore, is whether this demand was "specific" and "under the contract" in question

in the relevant sense.

IHS says the answer is no.  It points to Federal Circuit precedent that reads the statute and

regulations to require "a clear and unequivocal statement that gives the contracting officer

adequate notice of the basis and amount of the claim."  Dkt. 15-1 at 18 (quoting *Cont. Cleaning*

*Maint.*, 811 F.2d at 592).  And TCC's claim was, in IHS's view, "anything but clear."  *Id.*  What

troubles IHS about TCC's letter is that, although it repeatedly discusses the Title V Compact, it

also contains some indications that TCC was seeking relief under the Title I Contract as well.

Notably, the letter references "contract**s**," in the plural, several times.  Dkt. 15-1 at 19.  The

schedules attached to the letter also mention both contracts and, according to IHS (and TCC does

not dispute it), they have the contract numbers for both contracts listed at the top.  *Id.*  IHS

argues that these references rendered TCC's submission "so opaque" with respect to what sum of

money TCC was asking for and under which contract that IHS was never put on notice of the

basis and amount of TCC's claim.  *Id.* at 18–19.

The Court declines to accept such an exacting interpretation of what is, as IHS

acknowledges, a mere notice requirement.  The Court of Federal Claims has repeatedly

explained that evaluating the sufficiency of a claim for presentment purposes is a practical, rather

than a technical exercise, and that a claim need only "be stated in a manner which allows for

reasonable determination of the recovery available at the time the claim is presented and/or

decided by the contracting officer."  *Metric Constr. Co. v. United States*, 1 Cl. Ct. 383, 391

(1983).  Whether a claimant provided adequate notice is thus a "common sense analysis" that

"views the contractor's submission as a whole." *CPS Mech. Contractors, Inc. v. United States*, 59 Fed. Cl. 760, 763 (2004); *id.* (noting that "[t]o be adequate" a claim need only "sufficiently inform the [contracting officer] of what is being claimed such that the CO can meaningfully review the claim"); *see also Menominee Tribe of Wis. v. United States*, 764 F.3d 51, 55 (D.C. Cir. 2014), *aff'd*, 577 U.S. 250 (2016) (explaining that a claim request "need not be detailed" and may consist of a "short written statement outlining the basis of the claim, estimating damages, and requesting a final decision"). A contractor's submission can meet this threshold even if some of the factors on which the contractor's demand is based "are, or will be disputed," *Metric Constr.*, 1 Cl. Ct. at 391, or if some amount of work on the contracting officer's part is required to determine the claimant's bottom-line, *see Tunica-Biloxi Tribe of La.*, 577 F. Supp. at 410 (noting that although a claimant's submission was "hardly a model of clarity, it nevertheless provide[d] sufficient information for a reviewing agency like IHS to calculate the amount of damages alleged for each claim through 'simple arithmetic'" (quoting *Metric Constr.*, 1 Cl. Ct. at 392)). Nor, finally, need the sum certain requested even be the correct measure of what the claimant is owed, when all is said and done. *See Sun Eagle Corp. v. United States*, 23 Cl. Ct. 465, 472 (1991). The point of the administrative review process, after all, is to vet the accuracy of claims and to resolve disputed facts. In sum, although presentment imposes certain non-negotiable obligations on claimants, the bar for meeting those obligations is not as high as IHS suggests. The purpose of the notice requirement is to provide an opportunity for the contracting officer to review the claim, not to weed out claims or to limit the government's exposure.

Viewed under the appropriate standard, TCC's claim was adequate. The table on the first page of its claim letter not only sets forth the total value of TCC's claim—$12,153,793—it also breaks that total down into its constituent parts so that its basis can be better understood. Dkt. 1-

4 at 1.  IHS does not dispute that the claim was for a sum certain and that it was for identified categories of costs.

Instead, IHS's argument turns on the contention that TCC failed to attribute the amount sought "to either of [the] two unique contracts in effect during the timeframe at issue."  Dkt. 15-1 at 17.  That contention, however, is difficult to square with the words that appear in the claim letter itself.  To start, the letter is captioned: "Contract Disputes Act claim for unpaid contract support costs due in FY 2013 under Indian Self-Determination Act Compact and associated Funding Agreements."  Dkt. 1-4 at 1.  There is little doubt that the "Compact" refers to the Title V Compact at issue in this case, and the parties agree that the Compact was accompanied by an "associated" funding agreement, which was itself subject to "modifications," *see* Dkt. 15-1 at 7, 11; Dkt. 1 at 4-5 (Compl. ¶¶ 11, 13); Dkt. 17 at 6-7.  Read in this light, a contracting officer would have little difficulty in construing the caption of the claim letter to seek relief under the Title V Compact, the FY 2011-2013 Funding Agreement, and any related modifications to those agreements.  Significantly, the caption says nothing about the Title I Contract.

The body of the letter reaffirms this understanding.  The very first sentence seeks "payment of $12,153,793 plus interest, due and owing to TCC under the provisions of the above-refenced Compact and associated funding agreements, as amended, in effect between the parties for fiscal year 2013."  Dkt. 1-4 at 1.  Again, that assertion is unambiguous and does not even hint at a claim under the Title I Contract.  Then, after including a chart specifying the specific categories of costs at issue and explaining that the claim was submitted pursuant to the CDA and ISDEAA, the letter continues: "During the covered years, TCC's Compact, funding agreements, indirect cost agreements and the ISDEAA obligated the United States to pay TCC no less than the full amount of contract support costs, including indirect costs and direct contract support

costs, associated with TCC's operation of the IHS program, functions, services, and activities

specified in TCC's contracts with IHS, as amended." *Id.* Once again, the claim is

unambiguously premised on the "Compact" and the associated agreements.

Taken as a whole, the letter constituted a "clear and unequivocal statement" that gave

IHS "adequate notice of the basis and amount of the claim." *Cont. Cleaning Maint.,* 811 F.2d at

592. Upon reading the letter, the contracting officer would have known how much money TCC

wanted and the reasons why it thought it was entitled to it. Nothing more is needed. There was

no mistaking that TCC was claiming funds allegedly owed under the Title V Compact.

In response, IHS observes that TCC's claim letter thrice uses the plural "contracts"

instead of the singular "contract." Dkt. 15-1 at 19, 21; Dkt. 19 at 6, 8–9. That usage might

reasonably be explained by the fact that TCC's Title V Compact claim involved multiple

agreements—the Compact itself, the funding agreement, and any modifications to that

agreement. Dkt. 1-4 at 2. But, even if TCC was arguably sloppy at times and used the plural

when the singular was called for, that imprecision is far from sufficient to overcome the letter's

repeated, clear assertions that the claim sought payment for amounts due under the Compact and

"associated" agreements. IHS never suggests that the Title I Contract was an "associated"

agreement for these purposes, and, indeed, one can easily imagine that the agency would have

declined to consider a claim for damages under the Title I Contract had TCC sought such relief

while merely referring to an "associated" agreement.

In any event, it cannot reasonably be maintained that a few instances of plural rather than

singular language rendered TCC's request inscrutable or mysterious. "The content, not the

form," of a submission "determines what is sought in the claim." *Bruhn Newtech, Inc. v. United

States*, 129 Fed. Cl. 656, 663 (2016). "[N]o magic words"—or magic forms of tense— "[are]

required."  *Id.*; *see Placeway Constr. Corp. v. United States*, 920 F.2d 903, 908 (Fed. Cir. 1990)

("[T]his court [has] de-emphasized the importance of the form in which claims are submitted,

stating, 'We know of no requirement in the Disputes Act that a "claim" must be submitted in a

particular form or use any particular wording.'" (quoting *Cont. Cleaning Maint.*, 811 F.2d at

592)).

IHS's arguments based on the supporting financial schedules are more substantial but still

fail to demonstrate that TCC's administrative notice was fatally deficient.  On those schedules,

TCC references the Title I Contract, and, apparently, also references the corresponding contract

number.  Dkt. 1-4 at 5–6.  The Court agrees with IHS that a reasonable contracting officer could

have concluded that those analyses—standing alone—supported a claim for relief under both the

Title V Compact and the Title I Contract.  But when viewed in the context of TCC's entire

submission, those references to the Title I Contract are best viewed as an oversight in the

supporting materials, and not as a separate request for damages under a contract that TCC never

mentioned in its claim letter.  When considered together with the letter's caption and text, it

cannot be said that these column labels stood as a barrier to IHS receiving reasonable notice of

the "basis and amount" of TCC's claim.  *Cont. Cleaning Maint.,* 811 F.2d at 592.  The amount

TCC sought was clear: $12,153,793.  Dkt. 1-4 at 1.  Whether that amount represented a correct

calculation of what IHS owed TCC under the Title V Compact, was slightly inflated because

TCC mistakenly included a small amount that TCC could have sought, but did not seek, under

the Title I Contract, or instead was incorrect for any other reason is a merits question and not a

jurisdictional one.

Nor could the mistaken inclusion of expenses from the Title I Contract have had a

significant impact on the total amount at issue, thereby preventing IHS from forming a

reasonable estimate of the funds it might have to pay.   The "Cumulative Funding Report" for the

Title V Compact, which IHS proffers in an exhibit to its motion to dismiss, "shows [a] total FY

2013 funding of   $52,617,909," including "$1,871,568 in direct Contract Support Costs . . . and

$6,999,836 in indirect Contract Support Costs."  Dkt. 15-1 at 22–23 n.8.  In contrast, under the

Title I Contract for FY 2013, TCC "received $704,771, including $283 in direct Contract

Support Costs and $126,873 in indirect Support Costs."  *Id.* at 23 n.8.  Accordingly, accepting

IHS's reported figures as at least in the ballpark, even if TCC mistakenly included a number

approximating the full value of what was paid for contract support costs under the Title I

Contract, that would have amounted to only about 1% of the $12,153,793 that TCC sought in its

September 30, 2019 claim.

        Moreover, to the extent TCC mistakenly included items related to the Title I Contract in

its claim, IHS has proven itself up to the task of parsing the details and developing an informed

position, demonstrating that the information TCC provided was sufficient to allow IHS

"meaningfully [to] review the claim."  *CPS Mech. Contractors*, 59 Fed. Cl. at 763.  IHS's brief

argues that the figures on which TCC based its calculations correspond exactly to certain items

from the Title V Compact added together with corresponding items from the Title I Contract.

Dkt. 15-1 at 22–23.  The Court, of course, takes no position at this time on whether IHS is

correct about that.  But the fact that IHS was able to form a view on the issue with the materials

it had in hand confirms that it had ample information to form an opinion respecting TCC's claim

and could easily have denied relief to the extent the schedules sought amounts in excess of the

amount due under the Title V Compact and the agreements affiliated with the Compact, which is

all that the claim letter sought.  Courts have repeatedly held that if the amount of damages arising

from a claim can be determined with "simple arithmetic," the claim has been adequately

presented.  *See, e.g.*, *Tunica-Biloxi Tribe of La.*, 577 F. Supp. 2d at 410; *Metric Constr. Co.*, 1 Cl. Ct. at 392; *CPS Mech. Contractors*, 59 Fed. Cl. at 764.  Here, no arithmetic was necessary to ascertain the amount that TCC was seeking—that is, $12,153,793—and IHS had no apparent difficulty assessing the merits of that claim.

None of the authorities IHS invokes in support of its more demanding view of the notice requirement can bear the weight IHS places on them.  The first is the interpretive principle that waivers of sovereign immunity are to be strictly construed in favor of the sovereign.  Dkt. 15-1 at 17; *see also Lehman v. Nakshian*, 453 U.S. 156, 161 (1981) ("[L]imitations and conditions upon which the Government consents to be sued must be strictly observed and exceptions thereto are not to be implied.").[2]  The second is the IHS regulation that defines a "claim" as "a written demand . . . asking for . . . payment of a specific sum of money under the contract."  25 C.F.R. § 900.218(a)(1).  As the Court understands IHS's argument, these authorities work in tandem: the regulation uses the definite article "the" and refers to a singular "contract," and this language must be strictly construed to exclude any submission that refers to more than one contract.

But even accepting that contestable interpretation of the regulation,[3] TCC submitted a "claim."  It asked in writing for $12,153,793—a specific sum of money—"due and owing to

---

[2] TCC argues that it has a countervailing (and codified) canon: 25 C.F.R. § 900.3(b)(11), which states that "The Secretary's commitment to Indian self-determination requires that these regulations be liberally construed for the benefit of Indian tribes and tribal organizations to effectuate the strong Federal policy of self-determination and, further, that any ambiguities herein be construed in favor of the Indian tribe or tribal organization so as to facilitate and enable the transfer of services, programs, functions, and activities, or portions thereof, authorized by the Act."  Because IHS's motion fails even without resort to this regulation, the Court need not decide whether it applies to the waiver of sovereign immunity at issue in this case.

[3] Among other things, that reading of the definition of "claim" proves too much, since here—as, presumably, in many or most cases—the government's obligation is premised on several related agreements, including the overarching compact or agreement, the funding agreement, and

TCC under the provisions of the above-referenced Compact and associated funding agreements, as amended, in effect between the parties for fiscal year 2013." Dkt. 1-4 at 1.  The "above-referenced Compact" is TCC's "Indian Self-Determination Act Compact"—*i.e.*, the Title V Compact.  *Id.*  A request for a dollar figure under a particular contract satisfies § 900.218(a)(1) even by IHS's own strict-construction lights.  As explained, the specific sum of money TCC requested may or may not constitute an accurate assessment of what it was due under the Title V Compact (because that figure may include a small amount related to the Title I Contract, or it may be incorrect for any number of other reasons).  But asking for an incorrect specific sum under a contract is not the same thing as asking for an unspecific sum under an unspecified contract or contracts.  This case might involve the former situation, but it does not present the latter.

Notably, IHS fails to point to any case in which a court has deployed the sovereign immunity canon to render a claim like TCC's inadequate.  To the contrary, courts no doubt aware of that maxim have time and again recognized that CDA presentment is a notice requirement, not something more demanding.  *See, e.g.*, *CPS Mech. Contractors,* 59 Fed. Cl. at 763–64 (recognizing that presentment is jurisdictional but also that it requires only "a clear and unequivocal statement that gives the CO adequate notice of the basis for the claim" and that allows "the amount in dispute" to be "easily determined"); *Cont. Cleaning Maint.*, 811 F.2d at 591–93 (same); *Tunica-Biloxi Tribe of La.*, 577 F. Supp. 2d at 407–11 (same).  Although IHS repeatedly cites to *M. Maropakis*, that case is consistent with this understanding.  There, the Federal Circuit cited to the strict requirements of sovereign immunity to reject the notion that a

---

whatever modifications the parties may have adopted.  That is the way government contracting typically works.

claimant could "ignore the jurisdictional requirements of the CDA" by failing to provide "adequate notice" of the actual value of its claim, "state a sum certain," and "request a final decision." *M. Maropakis*, 609 F.3d at 1329.  TCC, by contrast, did not ignore these requirements and, in fact, requested a specific sum from IHS.  Dkt. 1-4 at 1.  Even if not crystal clear, TCC's claim letter put IHS on notice, which is all it had to do.

**B.      Whether TCC Presses a Different Claim Than It Did Before IHS**

Shifting its emphasis, IHS argues that TCC now seeks to correct the defects with its presentment by bringing a different claim before this Court than it did before IHS, effectively circumventing presentment.  Dkt. 15-1 at 14–15.  In its complaint and briefing, TCC has steadfastly maintained that it seeks relief under only the Title V Compact.  Dkt. 1 at 13 (Compl. ¶ 43); Dkt. 17 at 7.  This TCC may not do, says IHS, when its initial claim letter sought relief under both the Compact and the Title I Contract, or alternatively, was so vague that it was impossible to determine which contract or contracts were at issue.  Dkt. 15-1 at 21.  IHS suggests that the numbers tell the story, pointing out that although the figures TCC provided with its claim letter cannot be reconciled with the funding TCC received and expenses it incurred under the Title V Compact, they do match up with the equivalent values for the Title V Compact and Title I Contract added together.  Dkt. 15-1 at 22–23.  For instance, according to IHS, what TCC's second schedule labels "Total Funding Awarded" corresponds not to the total funding IHS awarded TCC under the Title V Compact, but rather the combined value of the funding for the Title V Compact and Title I Contract.  *Id.*  IHS insists that this and similar examples it offers show that TCC asserted claims under two contracts at the administrative level and that it is not playing it straight with the Court now.  *Id.*

There are several problems with this reasoning.  Most notably, it fails to accept the possibility that TCC's claim letter was premised, as the letter says it was, on an alleged breach of the "Compact and associated Fund Agreements," Dkt. 1-4 at 1, and that the inclusion of a small amount from the Title I Contract in the attached schedules was simply an oversight, which IHS or TCC could easily have corrected.  Or, framed more generally, IHS's alternative argument adds little, if anything, to its motion.  If IHS were correct that TCC's presentment was defective, that alone would deprive the Court of jurisdiction.  But if not, then the premise of this alternative argument—that TCC presented an overly vague claim stemming from two contracts—is faulty. Because the Court holds that TCC adequately presented its claim to IHS, it necessarily rejects the notion that this claim was a two-contract jumble irreconcilable with the demands TCC more clearly makes in its complaint.

Putting this difficulty aside, even on its own terms IHS's different-claim argument is unpersuasive.  IHS is correct that a court action under the CDA "must be 'based on the same claim previously presented to and denied by the contracting officer.'"  *Scott Timber Co. v. United States*, 333 F.3d 1358, 1365 (Fed. Cir. 2003) (quoting *Cerberonics, Inc. v. United States*, 13 Cl. Ct. 415, 417 (1987)).  This rule follows from 41 U.S.C. § 7103(a)'s requirement that before a court can exercise jurisdiction over a claim under the CDA, "the contractor must have received the contracting officer's final decision on that claim."  *M. Maropakis*, 609 F.3d at 1328. To determine whether a plaintiff has satisfied this condition, courts assess whether the complaint "is based on the same set of operative facts underlying the claim presented to the contracting officer."  *Cerberonics*, 13 Cl. Ct. at 417.  Under the "operative facts" inquiry, "[i]f the court will have to review the same or related evidence to make its decision" as did the contracting officer, "then only one claim exists."  *Placeway Const.*, 920 F.2d at 907.  If, "[o]n the other hand," "the

claims as presented to the [contracting officer] will necessitate a focus on a different or unrelated set of operative facts as to each claim, then separate claims exist." *Id.* This analysis focuses on the core factual basis for the claim, not every last detail. For example, a plaintiff can request greater damages than it did before the contracting officer, *Santa Fe Eng'r's, Inc. v. United States*, 818 F.2d 856, 858 (Fed. Cir. 1987), and even "assert differing legal theories," so long as it ultimately "claim[s] essentially the same relief," *Scott Timber*, 333 F.3d at 1365. Because the operative facts test exists to vindicate the statutory requirement of presentment, courts must also evaluate "whether the scheme of adjudication prescribed by the CDA is undermined . . . by circumventing the statutory role of the contracting officer to receive and pass judgment on the contractor's entire claim." *Affiliated Constr. Grp., Inc. v. United States*, 115 Fed. Cl. 607, 612 (2014) (quoting *Cerberonics*, 13 Cl. Ct. at 418). "In other words, the claim before the court cannot be said to arise from the same operative facts unless it is clear that the claim presented to the contracting officer was specific enough to give the officer notice of the basis of the claim and allow him to make an informed judgment about it." *Id.*

TCC's claims before this Court are based on the same "operative facts" that were presented to IHS. The relief sought in the complaint is identical to that which TCC sought before the contracting officer, except that TCC has opted not to seek one category of relief that it sought there. Dkt. 1 at 21 n.4; *compare* Dkt. 1 at 21 (Compl. ¶ 78), *with* Dkt. 1-4 at 1. As a result, every dollar of damages TCC seeks here it sought from IHS in the first instance. Dkt. 1 at 21 n.4. This is, by any standard, "essentially the same relief," *Scott Timber*, 333 F.3d at 1365, and, for that reason, TCC's lawsuit does not raise any prospect of circumvention. TCC is not asking this Court to decide a new question or to consider a claim that IHS was denied the opportunity to consider. To the contrary, TCC is asking the Court to decide a subset of the

questions it presented in the administrative process.  The sort of shift that raises the specter of circumvention is a request for *new* or *greater* relief.  TCC complaint narrows the scope of its claim and thus does just opposite.

IHS closes with a warning: "Under Tanana Chiefs Conference's theory of the case, a contractor could submit claims tied to several contracts and so long as some sum was demanded, the onus would be on the relevant agency to sort out the source of its obligation to pay that alleged sum.  There would be no requirement for the claimant to specify the source of the sum demanded, including by identifying the contract giving rise to any obligation to pay."  Dkt. 19 at 12.  The Court fails to see how that is so.  TCC did specify the source of the sum demanded, just as it identified the contract giving rise to IHS's alleged obligation to pay.  For all its hand wringing about TCC's letter, IHS cannot point to a single sentence in the claim letter itself in which TCC requested payment under any contract other than the Title V Compact.  Indeed, if anything, it is IHS's position that raises the specter of confusion, since it invites contracting officers to ignore the text of the claim letter and, instead, to consider whether any supporting materials provided along with the claim include an element of damages attributable to a different contract and, if so, to decline to consider the claim—thereby precluding judicial review—based on his or her belief that the supporting documentation shows that the claim is actually for amounts attributable to a different contract.  IHS's concern about whether the claim that TCC presented in the administrative process and that it seeks to pursue before this Court erroneously includes amounts related to a different contract is fair game.  But that is a question for another day.

## CONCLUSION

For the foregoing reasons, the Court **DENIES** Defendants' motion to dismiss.  Dkt. 15.

**SO ORDERED**

<u>/s/ Randolph D. Moss</u>
RANDOLPH D. MOSS
United States District Judge

Date: September 15, 2022